<u>NOT FOR PUBLICATION</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANDRES AUGUSTO CASTENADA CARRANCO,<br><br>        Petitioner,<br><br>v.<br><br>ARIANNA CABRERA MUÑOZ,<br><br>        Respondent. | Civil Action No. 12-7299 (JLL)<br><br>**AMENDED OPINION**[1] |

**LINARES,** District Judge.

**I.     INTRODUCTION**

This matter comes before the Court by way of a petition (the "Petition") for the return of a four-year-old child to Mexico pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Convention"), implemented through the International Child Abduction Remedies Act, 42 U.S.C. § 11601 *et seq*. The Court has considered the parties' written submissions, as well as the arguments and evidence presented on the record during an evidentiary hearing held on January 10, 2013. For the reasons set forth below, the Petition is granted to the extent that it seeks an order that Respondent return the parties' child to Mexico.

**II.    FINDINGS OF FACT**[2]

---

[1] The Court issues this Amended Opinion to correct a typographical error on pages 6-7 of the original Opinion. The Order entered as Docket Entry 11 on January 14, 2013 remains in full effect.

[2] The Court's findings are based on the evidence presented on the record during the January 10, 2013 hearing. The facts of this case are largely uncontested. Although there are some inconsistencies regarding the dates the parties claim that certain events happened, the actual dates of these events are not important to the Court's analysis, or to the ultimate outcome. The Court sets forth only those facts that it considers relevant to the parties' dispute.

1

Petitioner Andres Augusto Castenada Carranco is a Mexican citizen currently living in Chiapas, Mexico.  Respondent Arianna Muñoz Cabrera is a Cuban citizen and a U.S. legal permanent resident currently living in Newark, New Jersey.

Petitioner and Respondent were married in Cuba in or about October 2006.  Following their marriage, the parties lived in Chiapas, Mexico as a couple.  There, they had a child—Ana Daylen Muñoz Carranco ("Ana")—who was born on April 9, 2008.  Respondent was Ana's primary caretaker, as she did not work outside the home in Mexico.

In November 2009, Petitioner traveled to the United States with Respondent and Ana on tourist visas to visit Respondent's father and stepmother in Newark, New Jersey.  Petitioner returned to Mexico after approximately two weeks, while Respondent and Ana remained in New Jersey for approximately a month and a half.  Upon Respondent and Ana's return to Mexico in December 2009, the parties experienced marital discord.  Consequently, Respondent told Petitioner that she wanted to live with her parents in New Jersey.  Petitioner then told Respondent that "she could leave alone, but that the child wasn't leaving." (*See* Hearing Tr. 39:22-24.)

On July 9, 2010, the parties entered into a consent agreement that, in relevant part, required (1) Petitioner to take Ana to Houston, Texas for purposes of remaining in the United States as a tourist until December 15, 2010; and (2) Respondent to return Ana to Petitioner on December 15, 2010.  (Ex. J5.)

On or about July 22, 2010, the parties entered the United States via Mexico's border with Texas.  Petitioner and Ana entered with tourist visas, and Respondent was paroled pursuant to the Cuban Adjustment Act.  Approximately one day later, Respondent and Ana traveled to New Jersey where they stayed with Respondent's family, and Petitioner returned to Mexico.

At some point between September and October 2010, Respondent asked Petitioner whether she could return Ana to Mexico before December of that year. Respondent wanted to return Ana prior to the date agreed upon in the consent agreement because she wanted time to adapt to living in New Jersey. Petitioner agreed to accept Ana's early return in or about September/October 2010 , and Respondent sent Ana to Mexico shortly thereafter. Petitioner was Ana's primary caretaker from the time Ana returned to Mexico until she ultimately left in May 2012.

At some point between September/October 2010 and December 2010, Respondent asked Petitioner to return Ana to New Jersey; Petitioner refused, as he did not want to interrupt Ana's schooling in Mexico. In February 2012, however, Petitioner finally agreed to allow Ana to visit Respondent from May to August of that year. Of note, Respondent acknowledged that she and Petitioner orally agreed that Ana would visit only for the summer, and would return in time to start the 2012-2013 school year in Mexico. (*See* Hearing Tr. at 60:15-17; 62:9-19.) In March 2012, Petitioner paid Ana's tuition for the 2012-2013 school year in Mexico. (*See* Ex. J3.)

On or about May 6, 2012, Petitioner and Ana traveled to Houston, Texas where they met Respondent. Respondent subsequently traveled to New Jersey with Ana, and Petitioner returned to Mexico.

In June 2012, Respondent informed Petitioner that she wanted Ana to remain in New Jersey permanently, and would not return Ana to Mexico in August 2012. Within days of learning that Respondent would not return Ana as agreed, Petitioner filed an application with the Mexican Foreign Ministry requesting assistance in securing Ana's return to Mexico.[3] (*See* Ex.

---

[3] This application lists Respondent's address as one at which Respondent denies ever living. As this Court does not find that Petitioner intentionally provided an incorrect address in his application to the Mexican Foreign Ministry, the fact that said application contains an address that does not belong to Respondent is irrelevant to the Court's analysis.

3

J2.) Subsequently, Petitioner obtained legal counsel in the United States to file his Petition with this Court.

In September 2012, Respondent enrolled Ana in a Newark school. Thereafter, in early October 2012 Petitioner traveled to New Jersey, and stayed at the home of Respondent's father and stepmother in Newark. Within a week of his arrival in New Jersey, Petitioner told Respondent that the purpose of his visit was to legally secure Ana's return to Mexico.

On November 27, 2012, Petitioner filed his Petition with this Court. He personally served Respondent with copies of the Petition and his application with the Mexican Foreign Ministry on or about December 5, 2012. Petitioner returned to Mexico on December 15, 2012. He subsequently traveled to New Jersey again on January 6, 2013 to appear for the evidentiary hearing this Court held on January 10, 2013.

From early May 2012 until the present, Ana has resided with Respondent in New Jersey, and has grown attached to Respondent's father, stepmother, and two brothers. Throughout this time, Petitioner has regularly communicated with Ana by telephone.

### III.   CONCLUSIONS OF LAW

#### A. Jurisdiction

This Court's jurisdiction is premised on 42 U.S.C. § 11603(a), which provides that "[t]he courts of the States and the United States district courts shall have concurrent jurisdiction of actions arising under the Convention." Mexico and the United States are contracting states under the Convention. Accordingly, this Court has subject matter jurisdiction over this matter.

#### B. Legal Standard

The Hague Convention "does not provide a forum to resolve international custody

disputes, but rather it provides a legal process to restore the status quo prior to any wrongful removal or retention, and to deter parents from engaging in international forum shopping in custody cases." *See Karpenko v. Leendertz*, 619 F.3d 259, 263 (3d Cir. 2010). "Indeed, Article 19 of the Hague Convention provides that a decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody dispute." *Carrascosa v. McGuire*, 520 F.3d 249, 260 (3d Cir. 2008) (internal quotation marks and citation omitted).

To secure the return of a child under the Convention, a "petitioner bears the burden of proving by a preponderance of the evidence that the child was habitually resident in a State signatory to the Convention and was wrongfully removed to a different State as defined by Article 3." *Karpenko*, 619 F.3d at 263. Article 3 of the Convention provides as follows:

> The removal or retention of a child is to be considered wrongful where –
>
> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

In deciding whether a petitioner has made a *prima facie* case for relief under the Convention, the Third Circuit has admonished lower courts to determine "(1) when the removal or retention took place; (2) the child's habitual residence immediately prior to such removal or retention; (3) whether the removal or retention breached the petitioner's custody rights under the law of the child's habitual residence; and (4) whether the petitioner was exercising his or her

5

custody rights at the time of removal or retention." *See, e.g., Karpenko*, 619 F.3d at 263 (citation omitted).

"After a petitioner demonstrates wrongful removal or retention, the burden shifts to the respondent to prove an affirmative defense against the return of the child to the country of habitual residence." *Karkkainen v. Kovalchuk*, 445 F.3d 280, 288 (3d Cir. 2006). "These affirmative defenses are narrowly construed to effectuate the purposes of the Convention and, even where a defense applies, the court has the discretion to order the child's return." *Id.* "The affirmative defenses require [that a] respondent . . . prove (1) that a grave risk that the child's return would expose him or her to physical or psychological harm or otherwise place the child in an intolerable situation by clear and convincing evidence; (2) that the child's return would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms by clear and convincing evidence; (3) that the child is now settled in his or her new environment by preponderance of the evidence; (4) that the person from whom the child was removed was not exercising custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention by a preponderance of the evidence; or (5) that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its [sic] views by preponderance of the evidence." *Karpenko*, 619 F.3d at 263 n.3.

Should a court order that a child be returned to a petitioner pursuant to the Convention, it must also order "the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of proceedings in the action, and transportation costs related to the return of the child, unless the

6

respondent establishes that such order would be clearly inappropriate." *See* 42 U.S.C. § 11607(b)(3).

### C. Petitioner's Burden

#### 1. Date of Wrongful Retention

The first step in the analysis is determining the actual date of Ana's retention "so as to establish the relevant date of [Ana's] habitual residence for purposes of the Convention." *See Karkkainen*, 445 F.3d at 290.

Petitioner argues that the date of wrongful retention is August 2012 since that is the date the parties agreed Ana would return to Mexico. (*See* Pet. ¶ 10; Pet. Br. at 7.) Respondent, on the other hand, argues that the "measuring date for wrongful retention is December 5, 2012," as that is the date that "[P]etitioner filed a petition for the return of the child," and "personally served [R]espondent at her parent's home." (Resp. Br. at 12.)

The Third Circuit has endorsed the proposition that the retention date is the date that a parent unequivocally communicates his or her desire to regain custody. *See Karkkainen*, 445 F.3d at 290 ("This case does not require us to decide whether a child is not retained under the Convention until a parent unequivocally communicates his or her desire to regain custody. We assume that this standard applies . . ."); *see also Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 271 (3d Cir. 2007) (citing *Karkkainen* with approval). However, when parents mutually agree to allow their child to travel outside the country of habitual residence for a specifically defined period of time, the retention date is measured as of the date on which the parent outside the country of habitual residence fails to return the child as agreed. *See Karkkainen*, 45 F.3d at 290 (holding that wrongful retention date was the date that parent failed to return child to country of

habitual residence as agreed with other parent); *see also Paulus v. Cordero*, No. 12-986, 2012 U.S. Dist. LEXIS 90374, at *8 (M.D. Pa. June 29, 2012) (same).

Here, Petitioner and Respondent agreed in February 2012 that Ana would visit New Jersey until August 2012, and then return to Mexico. Respondent failed to return Ana to Mexico as agreed. Accordingly, the measuring date for wrongful retention is August 2012.

2. Habitual Residence

Having determined that August 2012 is the measuring date of Ana's retention, the Court must now determine the place of Ana's habitual residence as of this date. "The determination of a child's habitual residence presents a mixed question of fact and law." *Karkkainen*, 445 F.3d at 291. The inquiry "is not formulaic; rather, it is a fact-intensive determination that necessarily varies with the circumstances of each case." *See Whiting v. Krassner*, 301 F.3d 540, 546 (3d Cir. 2004).

The Third Circuit has defined "habitual residence" as "the place where [the child] has been physically present for an amount of time sufficient for acclimatization and which has a degree of settled purpose from the child's perspective." *E.g., Karpenko*, 619 F.3d at 263. In determining the situs of a child's habitual residence, courts must consider the child's "experience in and contacts with her surroundings, focusing on whether she developed a certain routine and acquired a sense of environmental normalcy by forming meaningful connections with the people and places she encountered in a country prior to the retention date." *Karkkainen*, 445 F.3d at 292 (internal quotation marks, citation, and alterations omitted).

The Court must also consider "the parents' present, shared intentions regarding their child's presence" in a particular country to determine whether that country can properly be called a child's habitual residence. *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995). A change

in a child's habitual residence requires that "the child's prior habitual residence . . . be effectively abandoned by the shared intent of the parents." *Tsai-Yi Yang*, 499 F.3d at 272. In cases involving a very young child, "acclimatization is not nearly as important as the settled purpose and shared intent of the child's parents in choosing a particular habitual residence." *Whitting*, 301 F.3d at 550. In such cases "the shared intent of the parents" is of "paramount importance." *Karkkainen*, 445 F.3d at 296.

Although courts have not provided a specific definition of a "very young child," the Third Circuit has observed that a four-year-old has the ability to acclimate because a "child of such age is not only aware of those around [her], but is able to form meaningful connections with the people and places [s]he encounters every day." *Whiting*, 391 F.3d at 551. Despite the Third Circuit's acknowledgment that a child of Ana's age is capable of acclimatization, this Court deems it unnecessary to perform an acclimatization analysis because it is clear that the parties lacked a mutually shared intent that New Jersey become Ana's habitual residence when they arranged for her May 2012 visit to New Jersey.

As of the date of her May 2012 trip, Ana was a habitual resident of Chiapas, Mexico. Indeed, that is where Ana was born and resided with the parties until Respondent immigrated to the United States in July 2010. Chiapas, Mexico is also where Ana has lived for all but approximately eight of the approximately 56 months she has been alive. For this Court to conclude that Ana's habitual residence changed from Mexico to New Jersey, this Court must find that it was the parties' "shared intent" that Ana abandon Mexico as the place of her habitual residence. *See Tsai-Yi Yang*, 499 F.3d at 272 (holding that child's habitual residence had not changed where parents intended for child's visit to last only two to three months); *see also Mozes v. Mozes*, 239 F.3d 1067, 1077 (9th Cir. 2001) ("[W]here the child's initial translocation from an

established habitual residence is clearly intended to be of specific, delimited period . . . courts have generally refused to find that the changed intentions of one parent led to an alteration in the child's habitual residence.").

The record in this case could not be clearer. Respondent, herself, has acknowledged that the parties orally agreed that Ana's visit to New Jersey in the summer of 2012 would be temporary. Under the terms of the parties' oral agreement, Respondent was to ensure that Ana return to Mexico at some point in August 2012. Respondent failed to do this, and decided unilaterally that Ana would permanently remain in New Jersey. Respondent's changed intentions cannot result in an alteration in Ana's habitual residence. *See Mozes*, 239 F.3d at 1067. Thus, this Court concludes that Ana's habitual residence in August 2012 was Chiapas, Mexico.

      3. <u>Whether Respondent's Retention of Ana Breached Petitioner's Custody Rights Under Mexican Law</u>

Having decided that Ana's habitual residence as of August 2012 was Chiapas, Mexico, the Court will now address whether Respondent's retention of Ana in New Jersey is in breach of Petitioner's custody rights under Mexican law. According to Petitioner, Respondent's unlawful retention of Ana is in breach of his custody rights under the Civil Code for the State of Chiapas, Mexico (the "Civil Code"), which provides that "both parents have custody of their minor children." (Pet. Br. at 5.) Additionally, Petitioner argues that Respondent's unlawful retention interferes with his rights under the consent agreement into which the parties entered in July 2010. (Pet. Br. at 5.)[4]

---

[4] The consent agreement to which Petitioner refers provides for the parties' obligations vis-à-vis Ana's travel between July and December 2010. (Ex. J5.) The agreement, however, does not provide either party with custody rights beyond December 2010. Accordingly, there is no basis to conclude that Respondent's actions have interfered with Petitioner's rights under the consent agreement.

In relevant part, the Civil Code provides as follows:

> **Article 407:** Non-emancipated minors are under parental authority/responsibility (*patria potestas*) as long as the ancestor that must exert it according to the Law exists.
>
> **Article 412**: In the case of separation between those who exert parental authority/responsibility (*patria potestas*), both parents must continue fulfilling their obligations and they can agree on the terms of its exertion, particularly in all things concerning the care and custody of the minors.[5]

(*See* Ex. J4.)

The Civil Code enshrines the concept of *patria potestas* which—as the First Circuit has explained—"is understood to mean the relationship of rights and obligations that are held reciprocally, on the one hand, by the father and mother or in some cases the grandparents and, on the other hand, the minor children who are not emancipated." *See Whallon v. Lynn*, 230 F.3d 450, 457 (1st Cir. 2000); *see also* Civil Code Art. 407. Thus, under the Civil Code, Petitioner had the right to exercise parental authority (i.e., *patria potestas*) over Ana at the time of retention. Respondent's retention of Ana in New Jersey against Petitioner's will violates Petitioner's right to exercise parental authority over Ana in accordance with the Civil Code.[6]

    4.   <u>Whether Petitioner was Exercising his Custody Rights at the Time of Retention</u>

The last hurdle that Petitioner must overcome to establish that Respondent's retention of Ana is wrongful under Article 3 of the Convention is proving that he exercised his custody rights as of the retention date. This is an easy burden. *See, e.g., Tsai-Yi Yang*, 499 F.3d at 277 ("[V]ery little is required of the applicant in support of the allegation that custody rights have actually been or would have been exercised.") (quoting *Adnan v.* 437 F.3d 381, 391 (3d Cir. 2006)). Petitioner "can show the exercise of custody rights by demonstrating that he . . . kept or

---

[5] The Court takes judicial notice of the provisions of the Civil Code pursuant to Article 14 of the Convention.

[6] Respondent does not dispute that Petitioner has custody rights under Mexican law.

11

sought to keep, some sort of regular contact with the child." *Tsai-Yi Yang*, 499 F.3d at 277 (citing *Baxter*, 423 F.3d at 370).

Respondent has acknowledged that during Ana's stay in New Jersey, Petitioner would call Ana "to see how she was." (Hearing Tr. 46:11-14.)  Additionally, upon learning that Respondent intended to retain Ana in New Jersey against his wishes, Petitioner promptly filed an application with the Mexican Foreign Ministry seeking assistance in obtaining Ana's return. These facts are sufficient to establish that Petitioner was exercising his custody rights at the time of retention.

Because Respondent retained Ana outside of Chiapas, Mexico—Ana's place of habitual residence— in breach of Petitioner's custody rights under Mexican law, and because Petitioner was exercising his rights at the time of the wrongful retention, this Court holds that Petitioner has satisfied his initial burden of proving that Ana was wrongfully retained in New Jersey. Accordingly, the Court will proceed to consider whether Respondent has established any affirmative defenses.

### D. <u>Affirmative Defenses</u>

Respondent has raised two affirmative defenses recognized by the Convention:  (1) that Petitioner consented[7] and acquiesced to Ana's retention in the United States, *see* Convention Art. 13(a), and (2) that a grave risk of psychological harm exists should Ana be returned to Mexico. *See* Convention Art. 13(b).  With respect to the first affirmative defense, Respondent bears the burden of proof by a preponderance of the evidence.  *See* 42 U.S.C. § 11603(e)(2)(B).  With

---

[7] In her written submissions, Respondent appears to raise the "consent" defense only in response to Petitioner's claim that she wrongfully removed Ana from Mexico.  As discussed above, at the January 10, 2013 hearing the parties agreed that Ana was not wrongfully removed.  Although Respondent does not specifically address the applicability of the "consent" defense to Petitioner's claim that Ana has been wrongfully retained, the Court has considered the viability of this defense to Petitioner's claim of wrongful retention.

respect to the second, Respondent bears the burden of proof by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A).

    (a) <u>Whether Respondent Consented and Acquiesced to Ana's Retention</u>

"Although analytically distinct, the defenses of consent and acquiescence under article 13(a) of the Hague Convention are both narrow." *Baxter*, 423 F.3d at 371. "The consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention." *Id.*

    i.    <u>Whether Petitioner Consented to Ana's Retention</u>

"In examining a consent defense, it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its [sic] home country." *Baxter*, 423 F.3d at 371. "The fact that a petitioner initially allows children to travel, and knows their location and how to contact them, does not necessarily constitute consent to removal or retention under the Convention." *Id.*; *see also Fabri v. Pritkin-Fabri*, 221 F. Supp. 2d 859, 871-72 (N.D. Ill. 2001) ("Many cases begin with a parent's taking the child away from home for a vacation or visit with the consent of the other parent, but nevertheless result in a Hague Convention order compelling the child's return."). The consent inquiry focuses on the Petitioner's subjective intent. *Baxter*, 423 F.3d at 371.

Although Petitioner consented to Ana's removal from Mexico, nothing in the record suggests that Petitioner consented to Ana's retention in New Jersey, or that he ever intended that Ana permanently relocate to New Jersey. Indeed, the parties' mutual intent *ab initio* was for Ana to return to Mexico in time to begin the 2012-2013 school year. When Respondent made known her intent to retain Ana in New Jersey, Petitioner immediately took action to secure Ana's return.

13

Thus, to the extent that Respondent argues that Petitioner consented to Ana's retention in New Jersey, that argument fails.

      ii.      <u>Whether Petitioner Acquiesced to Ana's Retention</u>

Like the consent inquiry, the acquiescence inquiry also focuses on a petitioner's subjective intent. *Baxter*, 423 F.3d at 371. "[T]he defense of acquiescence has been held to require [1] an act or statement with the requisite formality, such as testimony in a judicial proceeding; [2] a convincing written renunciation of rights; or [3] a consistent attitude of acquiescence over a significant period of time." *Baxter*, 423 F.3d at 371 (citation and internal quotation marks omitted). Based on the facts in the record, only the third of the aforementioned requirements is potentially applicable.

Respondent argues that the facts of this case are similar to those of *Schroeder v. Vigil-Escalera Perez*, 664 N.E.2d 627 (Ohio C.P. 1995), a decision of the Ohio Court of Common Pleas. *Schroeder* is inapposite because it did not specifically involve a Hague Convention petition, but a motion to dismiss a complaint seeking a legal separation between the plaintiff and her husband (the defendant) who resided in Spain. *Id.* at 629. In his motion to dismiss, the defendant argued that the plaintiff had wrongfully retained their child in Ohio in violation of the Convention. *Id.* Two months after asserting the alleged Convention violation as a ground for dismissing the complaint, the defendant filed a separate action in the federal district court for the District of Ohio seeking the return of his child to Spain. *Id.* In holding that the plaintiff's alleged wrongful retention of the child in Ohio was an insufficient ground upon which to dismiss the complaint, the court also held that the mother's retention was not wrongful under the Convention because the defendant's failure to seek the return of the child until six months after

14

the child was removed, despite knowing at all times where the plaintiff and child were, amounted to acquiescence. *Id.* at 633.

Aside from the fact that *Schroeder* is inapposite and non-binding, the facts of this case are distinguishable. Whereas the father in *Schroeder* delayed for six months in taking any action to secure the return of his child to Spain, Petitioner filed an application with the Mexican Foreign Ministry requesting assistance in obtaining Ana's return within days of learning that Respondent would not return Ana to Mexico. Subsequently, in October 2012 Petitioner traveled to New Jersey to initiate the filing of his Petition with this Court, and traveled to New Jersey again in January 2013 to attend the evidentiary hearing in connection with said Petition. Indeed, since learning that Respondent would not return Ana to Mexico within the timeframe the parties agreed upon in February 2012, Petitioner has consistently undertaken efforts to secure Ana's return. Nothing in the record suggests that Petitioner ever acquiesced to Ana's retention in the United States.

### (b) Whether Ana Would Face a Grave Risk of Psychological Harm if Returned to Mexico

Respondent argues that returning Ana to Mexico would expose her to a grave risk of psychological harm because she "has been the primary custodial parent for Ana," and has "taken care of her on a daily basis except for the period of time during which the petitioner refused to allow Ana to return to the respondent in the United States." (Resp. Br. at 23.)

The affirmative defense of grave risk of psychological harm has been held to apply in two sets of cases: (1) "when the return of the child puts the child in imminent danger . . . e.g., returning the child to a zone of war, famine, or disease . . ." and (2) "cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual

15

residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." *See Baxter*, 423 F.3d at 373.

Here, Respondent cannot prove by clear and convincing evidence that Ana would suffer a grave risk of psychological harm should this Court order her return to Mexico merely on account of Ana's attachment to her mother and her family in New Jersey. Indeed, Courts have generally rejected the argument that grave psychological harm would result from a child's separation from a parent with whom that child has formed a strong bond. *See, e.g., Friedrich* 78 F.3d at 1067-68 (the fact that child had grown attached to family and friends in Ohio was insufficient to show that child would suffer grave psychological harm if returned to Germany); *Nuñez-Escudero v. Tice-Menley*, 58 F.3d 374, 376 (8th Cir. 1995) (holding that "[t]he district court incorrectly factored the possible separation of the child from his mother in assessing whether the return of the child to Mexico constitutes a grave risk that his return would expose him to physical or psychological harm or otherwise place him in an intolerable situation."); *Rydder v. Rydder*, 49 F.3d 369, 373 (8th Cir. 1995) (rejecting the argument that "separating a child from his or her primary caretaker creates a risk of psychological harm" where there "was no specific evidence of potential harm to" the child).

Respondent cites *Steffen v. Severina P.*, 966 F. Supp. 922 (D. Ariz. 1997) for the proposition that that "the Court should find that it would be troubling to remove [Ana] from the parent who has been her primary custodial parent." (Resp. Br. at 23.) In that case, the court refused to order the return of a child to Germany upon concluding that the child faced a grave risk of psychological harm if separated from his mother with whom he had "bonded and attached." *Id.* at 926. Respondent's reliance on *Steffen* is misplaced because in that case the respondent introduced expert testimony of a psychologist who averred that the child would suffer

psychological harm as a result of the child's separation from his mother. Here, no such expert testimony was offered.

More importantly, merely to find it "troubling" to separate Ana from Respondent is an insufficient basis to hold that returning Ana would expose her to a grave risk of psychological harm. To be clear, this Court has no reason to doubt that Respondent and Respondent's extended family feel affection towards Ana, and sincerely believe that it would be in Ana's best interest to remain with them in New Jersey. However, this Court is not empowered to decide which parent should have primary custody over Ana, or the country in which Ana's interests would best be served. *See, e.g., Friedrich*, 78 F.3d at 1068 ("The exception for grave harm to the child is not license for a court in the abducted-to country to speculate on where the child would be happiest. That decision is a custody matter, and reserved to the court in the country of habitual residence."). Rather, this Court's role is to "restore the status quo prior to" Respondent's wrongful retention of Ana. *See Karpenko*, 619 F.3d at 263.

A thorough review of the record in this case compels this Court to conclude that there is no clear and convincing evidence that Ana would suffer a grave risk of psychological harm should she be returned to Mexico.

### E. Other Relief Requested in the Petition

In addition to requesting that this Court order Ana's return to Mexico and that Respondent pay all legal costs and fees in connection with this matter, Petitioner has also requested (1) an order directing the U.S. Attorney's Office to "investigate the possibility of criminal charges against Respondent;" (2) an order directing the U.S. Attorney's Office to contact the Mexican Ministry of Justice to assist in any request in connection with criminal charges that Mexican authorities may bring against Respondent; (3) an order directing that Ana's

name be entered into the national police computer system missing person section; and (4) an order directing that Respondent show cause as to why sanctions should not be imposed against her for abducting Ana.  (*See* Pet. at 6.)  Petitioner has not addressed the legal bases for these requests, and the Court is unaware of any authority upon which it may rely to grant these requests at this juncture.  Accordingly, these requests are denied.

## IV.   CONCLUSION

For the foregoing reasons, this Court holds that Petitioner has satisfied his burden of proving by a preponderance of the evidence that Respondent has wrongfully retained Ana in New Jersey in violation of the Convention.  Because Respondent has failed to establish an affirmative defense, Ana must return to Mexico.  Respondent must pay all costs and fees in connection with this matter unless she establishes that it would be inappropriate for this Court to order her to pay such costs and fees.  *See* 42 U.S.C. § 11607(b)(3).  The other requests in the Petition are denied.  An appropriate Order follows this Opinion.

Dated: January 14, 2013.

/s/ Jose L. Linares  
JOSE L. LINARES  
U.S. DISTRICT JUDGE